# EXHIBIT G

*PRIVILEGED & CONFIDENTIAL/ATTORNEY WORK PRODUCT*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTHERN CALIFORNIA

_____
)
)
STACY CHANG                           )   Case No.: 3:22-cv-02010-AMO
     Plaintiff,                      )
)
v.                                    )
)
CARLOS CASHMAN, ARROWSIDE             )
CAPITAL, LLC, ARROWSIDE FUND GP,      )
LLC, ARROWSIDE VENTURES, LLC,         )
CASHMAN FAMILY INVESTMENTS II LLC     )
and PERSEVERUS, LLC                   )
     Defendants.                     )
)
_____ )

# EXPERT REPORT OF JIM TIMMINS, ASA
## RETAINED BY DEFENDANTS

### APRIL 8, 2024

# TABLE OF CONTENTS

I.    *Introduction* ........................................................................................................ *4*

II.   *Qualifications and Compensation* ....................................................................... *5*

III.  *Documents Relied Upon And Works Utilized* ...................................................... *8*

IV.   *Summary Of Opinions* ........................................................................................ *8*

V.    *Background On The New Venture Market and Venture  Capital Funds* ........................ *12*

    A.    **How New Ventures Are Formed** ................................................................. **12**

    B.    **Historical Background of Venture Capital** ................................................. **14**

    C.    **Structure and Operation of Venture Capital Firms** .................................... **15**

    D.    **Qualifications, Compensation, and Incentives for Individuals at Venture Capital Firms** .... **18**

    E.    **Raising a Venture Capital Fund** ................................................................. **20**

VI.   *Background For the Case at Hand* ....................................................................... *23*

    A.    **Summary of Interactions Between Chang, Copeman, and Cashman** ............... **23**

VII.  *Opinions on the Interactions of Plaintiff and Defendants and Whether They Could Have Raised a Venture Capital Fund* ........ *26*

    A.    **The Interactions of Chang, Copeman, and Cashman Were Ordinary and Conformed to Custom and Practice in the Startup World and Venture Capital Business** .... **26**

    B.    **The Potential Team Did Not Create the Marketing Materials Needed to Support Institutional Fund Raising** .... **27**

    C.    **The Potential Team Did Not Create the Investment Closing Documents Needed to Support Institutional Fund Raising** .... **29**

    D.    **The Potential Team Did Not Do Any Premarketing of Arrowside to Potential Institutional Investors** .... **29**

    E.    **The Second Half of 2021 Was a Poor Time to Launch a New Fund in the Face of Declining Market Conditions** .... **30**

    F.    **A Large Number of First-time Funds Are Unsuccessful** ................................ **32**

    G.    **Based On the Lack of Preparation and Declining Market Conditions the Potential Team Could Not Have Raised a Fund in 2021 or 2022** .... **34**

VIII. *Opinions on the Plaintiff's Termination of Her Employment and Her Damages Claims* .... *34*

    A.    **Plaintiff Unreasonably Terminated Her Employment Before Arrowside Was Even Ready to Begin Marketing Let Alone Hold a First Close** .... **34**

    B.    **Plaintiff is Not Entitled to Wages or Other Compensation for Any Work That She Did in Connection With Discussing or Planning Arrowside** .... **35**

    C.    **Plaintiff is Making Outsized Claims of Financial Losses in Connection with Possible Carried Interest Payments** .... **36**

**Appendix A – Curriculum Vitae of Jim Timmins**

**Appendix B – Documents Relied Upon**

**Appendix C – Works Utilized**

## I.     INTRODUCTION

1.      I am a Managing Director of Spring Canyon Litigation Services, Inc. ("SCLS") and an expert in private equity fund operation. Morgan Brown & Joy, LLP ("MBJ") has retained me to provide expert services and testimony on behalf of the Defendants in *Stacy Chang* ("Plaintiff")*, v. Carlos Cashman, Arrowside Capital, LLC, Arrowside Fund GP, LLC, Arrowside Ventures, LLC, Cashman Family Investments II LLC, and Perseverus LLC* ("Defendants"), Federal District Court, District of Northern California, Case No.: 3:22-cv-02010-AMO  (the "Action"). In this expert report ("Expert Report"), I refer to the parties to the Action as "Plaintiff" and "Defendants," respectively. I use other capitalized terms from time to time, which are defined in the body of this report.

2.      I have been asked by MBJ to provide expert opinions regarding the custom and practice of individuals in the venture capital ("VC")  and related startup sectors in the entrepreneurial portion of the economy, including how individuals come together to discuss forming a new venture (whether that new venture is a new company or a new fund); the research, analysis, documents, and presentation materials required to form a new venture and present it to potential investors; what potential institutional investors in newly formed VC funds, especially first time VC funds, look for and expect to see when considering an investment in such new newly formed VC funds; and related matters, including the rates of failure of new ventures. I expect to testify about Plaintiff's behavior in this case, including how her behavior deviated from industry norms and guidelines, and Defendants' behavior in this case, including how their behavior followed industry norms and guidelines. I may also opine, in rebuttal, on matters raised in Plaintiff's expert report(s).

## II.      QUALIFICATIONS AND COMPENSATION

3.       SCLS provides litigation support and expert testimony in matters involving private equity and venture capital funds, portfolio companies, and fiduciary duties.

4.       SCLS was spun-out of Teknos Associates in 2018. I founded Teknos Associates in 2008 to provide financial advisory and business valuation services to technology-driven emerging growth companies, investment funds, and government agencies. Effective January 1, 2018, I sold my interest in Teknos Associates to some former colleagues.

5.       Before forming Teknos Associates, I was: a Managing Director of Pagemill Partners (now a Kroll/Duff & Phelps Business); a Managing Director of The Daiwa Securities Group, NIF Ventures (now NIF Sumitomo Mitsui Banking Corporation Ventures); and a General Partner of Glenwood Ventures and Glenwood Capital.  Earlier in my career, I was a Principal at Hambrecht & Quist and an Associate at Salomon Brothers.

6.       Attached as Appendix A is a copy of my current curriculum vitae which outlines my educational and work history and lists all my publications and the testimony that I have provided over the last ten years. I have testified and been accepted as an "expert" for the purposes of litigation by a court or arbitration panel many times; I have never been excluded or disqualified as an expert.

7.       I have provided expert services in connection with litigation on behalf of a range of companies, including AmerisourceBergen, Citigroup, FLIR Systems, Hewlett-Packard, Intel, National Semiconductor, Palo Alto Networks, Stitch Fix, Tesla Motors, Waymo (the self-driving car project of Alphabet fka Google), and Wells Fargo, plus a number of venture capital and other private equity firms, law firms, and the Internal Revenue Service.

8.      In 2016, I was appointed as Special Discovery Master in Delaware Chancery Court for the consolidated action, *In Re Cellular Telephone Partnership Litigation*, C.A. No. 6885-VCL, which involved breach of fiduciary duty claims by minority partners against the majority partner, AT&T, arising from a series of transactions that dissolved 15 limited partnerships and paid the minority partners in each limited partnership their pro rata shares of the value of their partnerships, as determined by a valuation firm hired by AT&T.  My report was accepted by the Vice Chancellor in its entirety.

9.      I received a BA from Trinity College, University of Toronto, and an MBA from the Graduate School of Business, Stanford University.

10.     I have been designated an "Accredited Senior Appraiser" in both "Business Valuation" and "Intangible Assets" ("ASA BV/IA") by the American Society of Appraisers ("ASA"), a "Master Analyst in Financial Forensics" ("MAFF") in "Business and Intellectual Property Damages" by the National Association of Certified Valuators and Analysts, and a "Certified Equity Professional" ("CEP") by the Certified Equity Professional Institute of Santa Clara University.

11.     During my more than 40-year career, I have provided investment banking, venture capital and other private equity investing, and business valuation services for a wide range of investment funds and portfolio companies.

12.     I have been involved in every aspect of private equity fund life, from formation and fundraising, to screening prospects and structuring investing in portfolio companies, to financial reporting for limited partners, to assisting portfolio companies with hiring, managing growth, raising additional capital, and eventual liquidity. I have met with and raised capital from many of the leading institutional investors in the venture capital sector.

13.     I have been a member of the board of directors (including the compensation committee and/or audit committee) of 15 private and public companies. And I have been a managing director and/or general partner (or similarly functioning principal) for more than ten investment funds and their related management entities.

14.     I have been a guest lecturer, teaching about private company investing, mergers and acquisitions, public offerings, equity incentives, and business valuation at Berkeley Law (formerly Boalt Hall School of Law), University of California Berkeley; the Haas School of Business, University of California Berkeley; the School of Law, Santa Clara University; the Graduate School of Business, Stanford University; and the Wharton School, University of Pennsylvania. I have been an instructor for the Practicing Law Institute ("PLI"), teaching continuing education programs for lawyers about investment term sheet negotiation. And I have been a speaker about other company and investment issues at numerous conferences and industry associations, in the US and abroad.

15.     I annually contributed to the PLI publication series, "Doing Deals: Understanding the Nuts and Bolts of Transactional Practice" (later renamed "Doing Deals: Keeping Pace with a Rapidly Changing Market") from 1998 to 2004.

16.     Compensation for the work performed in connection with this Action by me is billed on an hourly basis at $1,000 per hour for work and testimony and $500 per hour for travel. SCLS also is reimbursed for out-of-pocket travel and related expenses.

17.     Neither SCLS nor any member or contractor of SCLS has any interest in or relationship with Plaintiff or Defendants or their respective counsel and compensation is not contingent on the outcome of the conclusions of this Expert Report or the outcome of this Action.

### III.      DOCUMENTS RELIED UPON AND WORKS UTILIZED

18.      In preparing this Expert Report and in giving testimony, I have utilized and will utilize processes, methodologies, analyses, standards, and principles which are the same as those I have used in my more than 40-year advisory and transactional career.  I also have referred to and/or relied upon the documents, deposition materials, exhibits, books, articles, and other materials identified in Appendices B and C to this Expert Report and the materials identified in the text and footnotes herein.

19.      My analysis, opinions, and conclusions are based on the documents I have reviewed as of the date of this Expert Report and the assumed facts that I specify herein.  I did not assess the authenticity of documents.

20.      In connection with my anticipated testimony in this Action, I may use as exhibits various documents produced in this Action that refer or relate to the matters discussed in this Expert Report.  In addition, I may create or assist in the creation of certain demonstrative exhibits to assist me in testifying.

21.      My work in connection with this matter is ongoing and I may supplement this report if information that affects any of my opinions comes to my attention after this Expert Report is submitted. I intend to review the opinions, reports, and testimony of other witnesses, including other experts, in this matter and address any issues they raise, if so requested by counsel.

### IV.      SUMMARY OF OPINIONS

22.      I have been retained to provide opinions about:

     a.   How individuals come together to discuss forming a new venture (whether that new venture is a new company or a new fund); the research, analysis, documents,

and presentation materials required to form a new venture and present it to potential investors; what potential institutional investors[1] in a newly formed VC fund, especially a first time VC fund, look for and expect to see in connection with a newly formed VC fund; and related matters, including the rates of failure of new ventures.

b.  Whether the Defendants deviated from industry custom and practice of the VC and other startup sectors in the entrepreneurial portion of the economy when they spoke, corresponded, and met with the Plaintiff about the possibility of forming a new VC fund (later to be called and referred to hereafter as "Arrowside"), including whether by merely engaging in such conversations, written exchanges, and meetings the Defendants unreasonably created a false impression in the Plaintiff that the Defendants were completely committed to the project of forming Arrowside and to making the Plaintiff a partner in this new fund.

c.  Whether the Plaintiff or the Arrowside team created all of the documents, presentations, and other materials necessary to meet with and convince institutional investors to participate in the new fund.

d.  Whether there was any likelihood that institutional investors would have committed to the new fund with sufficient capital to make it economically viable.

---

[1] Institutional investors provide the overwhelming majority of capital for private equity and even within the sector, a large portion of the capital comes from the largest institutions such as national or state pension funds, private pension funds, insurance companies, foundations, and endowments. Wealthy individuals and family offices supply some capital, but it is small compared to what comes from institutions. Accordingly, it is nearly impossible to raise a typical $100 million VC fund without institutional investor participation and any such fund must be designed with the targeted institutional investors in mind. CFA Institute, "Private Equity Investments," 2023 Curriculum. Whyte, Amy, "These Are the Biggest Investors in Private Equity, *Institutional Investor*, June 14, 2018. https://www.institutionalinvestor.com/article/2bsxjfxhvm9dvwx7m0v7k/portfolio/these-are-the-biggest-investors-in-private-equity Zider, Bob, "How Venture Capital Works," *Harvard Business Review*, November-December 1998. https://hbr.org/1998/11/how-venture-capital-works

e.  Whether the Plaintiff acted reasonably when she terminated her employment with Founders Fund, allegedly in reliance on a commitment of employment by Arrowside, without first having an actual offer of new employment from Arrowside, and without Arrowside having raised sufficient capital to support the Plaintiff and other potential staff. And also whether the Plaintiff ought to have known that Arrowside was not yet sufficiently developed and funded to support her and other potential employees at the time she terminated her employment with Founders Fund.

f.  Whether the Plaintiff's claims of foregone income, both salary and carried interest payments, from either Founders Fund or Arrowside are tenuous and without sufficient support and are therefore merely speculative.

23.  As discussed more fully below, I have concluded the following:

a.  The manner in which the Plaintiff and the Defendants first came into contact with one another and then began a conversation about the possibility of forming a New Fund was entirely ordinary and conformed in all substantial ways with industry custom and practice for such meetings and conversations.

b.  In that same vein, the manner in which the Plaintiff and the Defendants carried on that conversation, including telephone calls, email exchanges, and eventually face-to-face meetings also was entirely ordinary and conformed in all substantial ways with industry custom and practice for such meetings and conversations, and, as such, did not unreasonably create a false impression in the Plaintiff that the Defendants were completely committed to the project of forming Arrowside and to making the Plaintiff a partner in such new fund, because in fact the Defendants

were earnestly engaged in a process of discovering whether investors would support such a new VC fund (which was a necessary precondition to actually raising Arrowside and to offering the Plaintiff a position connected to Arrowside).

c.  The Plaintiff and the team did not create all of the documents, presentations, and other materials necessary to meet with and convince institutional investors to commit capital to Arrowside and, in fact, a substantial amount of additional material would have been needed just in order to have a possibility of arranging such meetings with potential institutional investors, let alone have any real prospect of closing on commitments from such institutional investors to a new fund.

d.  There was no likelihood that institutional investors would have committed to Arrowside with sufficient capital to make it economically viable. Apart from the lack of documents, presentations, and other materials needed to schedule and have productive meetings with institutional investors, the VC industry had recently experienced one of its periodic 'booms' in its long term 'boom and bust' cycle and was beginning to retract from its historically large expansion. Historically it is substantially more difficult for a new VC fund to raise capital for the first time (or even for the second time) during such periods.

e.  The Plaintiff acted unreasonably when she prematurely terminated her employment with Founders Fund allegedly in reliance on a commitment of employment by Arrowside, without first having an actual offer of new employment from Arrowside, and without Arrowside having raised sufficient capital to support the Plaintiff and other potential staff. Given her experience in

the VC industry, even if only working as an executive assistant or 'chief of staff' at Founders Fund, the Plaintiff ought to have known that Arrowside was not yet sufficiently developed and funded to support her and other potential employees at the time she terminated her employment with Founders Fund.

    f.   The Plaintiff's claims of foregone income, both salary and carried interest payments, from either Founders Fund or Arrowside are tenuous and completely lack support, making them merely speculative. Furthermore, even in the unlikely event that all evidence of Plaintiff's alleged damages is admissible at trial, and a jury were to find the Defendants liable for some economic injury to the Plaintiff, it would be a double recovery for her to be awarded damages from Defendants based on her claims for lost salary and carried interest at both Founders Fund and Arrowside for the same period of time.

## V.    BACKGROUND ON THE NEW VENTURE MARKET AND VENTURE CAPITAL FUNDS

### A.    How New Ventures Are Formed

24.    The manner in which most new ventures come together is well known: two or more individuals talk among themselves, realize that they have a vision for a solution to a common problem, start working on that solution, and eventually monetize it by forming a company and selling the resulting product or service. It is so commonplace that it almost seems cliche. But, setting aside the cliche, it is in fact how most new companies or other new ventures begin.

25.    Consider the well known examples of Apple Computer founded by Steve Jobs, Steve Wozniak, and Ron Wayne (joined soon afterward by Mike Markkula), or Microsoft founded by Bill Gates and Paul Allen, or Facebook (now Meta) founded by Mark Zuckerberg,

Eduardo Saverin, Andrew McCollum, Dustin Moskovitz, and Chris Hughes, or Uber founded by

Travis Kalanick and Garrett Camp, or the granddaddy of them all, Fairchild Semiconductor,

founded by Gordon Moore, Sheldon Roberts, Eugene Kleiner, Robert Noyce, Victor Grinich,

Julius Blank, Jean Hoemi, and Jay Last (the so-called 'traitorous eight').

26.     And the same is true of new venture capital funds too, including such well known

examples as Benchmark, founded by Andy Rachleff, Bob Kagel, and Kevin Harvey (joined soon

afterward by Bruce Dunlevie, Bill Gurley, and Val Vaden) or Andreeson Horowitz founded by

Mark Andreeson and Ben Horowitz (joined soon afterward by John O'Farrell).

27.     In none of these examples did the individuals immediately incorporate and

promptly start paying themselves salaries. Instead there was a period of planning and discussion,

sometimes quite lengthy and sometimes including outsiders who might (or might not) join or

fund the eventual entity, before the founders gave up what they had been doing previously and

launched the new venture. In fact, there is a well known term for the unpaid labor during this

period: 'sweat equity.' It is defined as "a person or company's contribution toward a business

venture or other project…Sweat equity is commonly found in…the corporate world—especially

for startups."[2] In cash-strapped startups or entities which have not yet received funding, owners

often start with no salary and even employees typically accept salaries that are below their

market values in return for a stake or a potential stake in the company, which they hope to profit

from when the business is eventually sold. Of course, it comes with risks: "the biggest downside

of sweat equity is that the final value of your equity might be worth less than the work you put

---

[2] Kenton, Will, "Sweat Equity: What It Is, How It Works, and Example," *Investopedia*, updated June 27, 2022. https://www.investopedia.com/terms/s/sweatequity.asp

in. For new companies, workers take the risk that the company might fail, making their sweat equity worthless."[3]

### B.      Historical Background of Venture Capital

28.      The overall private equity[4] ("PE") industry in the US began and grew during the last several decades, slowly when conditions were unfavorable and more rapidly when conditions improved. Starting in the 1960s and continuing into the 1970s, private equity firms began to increase in number and in assets under management.  For example, Davis & Rock in 1961, Sutter Hill Ventures in 1964, Asset Management Company in 1965, Hambrecht & Quist in 1968, Kleiner Perkins and Sequoia Capital in 1972, TH Lee in 1974, Kohlberg, Kravis, & Roberts in 1976, Welsh Carter Anderson in 1979, and many firms in the 1980s and thereafter. All were organized as limited partnerships and all raised funds from institutional investors.

29.      Three main factors were important to this growth: changes in tax law and other regulation; advances in technology and life sciences and changes in business and consumer habits; and innovations in structuring investments and funds. Legal and regulatory changes, such as reductions in capital gains taxes or clarification of the 'prudent man rule,'[5] led to a massive increase in investment by pension managers in PE funds during a short amount of time.[6] Other factors contributed to the growth of the industry, including advances in semiconductor, computing, communications, and life science technologies and changes in business and

---

[3] *Ibid.*

[4] The term "private equity" is used to describe an entire class of investment strategies which focus on investment in the securities of companies which are not publicly traded (or which are taken private).  The class includes several subcategories: "venture capital" (investment using equity in early-stage companies), "mezzanine equity" or "growth equity" (investment using equity in later stage companies), "buyouts" (investment using equity and debt in larger companies), and others. Much of the history, regulation, structure, and other custom and practice of private equity applies equally to the various subcategories. However, because the Plaintiff and Defendants were contemplating venture capital investing, I have focused primarily on the venture capital subcategory.

[5] *29 US Code of Federal Regulations (C.F.R.)*, Section 2550.404a-1(b), first published in 1979.

[6] Cendrowski, Harry, James P. Martin, Louis W. Petro, and Adam A. Wadecki, *Private Equity: History, Governance, and Operations*, Hoboken, NJ: Wiley Finance, 2008, pp. 33-34.

consumer habits. Yet another element of this growth was the creation of carefully devised investment structures:  preferred stock and/or debt with equity features (*e.g.*, warrants) at the portfolio company level; and limited partnerships at the investment firm level.

30.     In the last few decades, the VC portion of the industry has grown very large. US firms raised $93.0 billion of new assets in 2020 among 927 funds closed, $169.2 billion of new assets in 2021 among 1,543 funds closed, and $172.8 billion of new assets in 2022 among 1,340 funds closed, but results fell substantially to $66.9 billion in new assets among 474 funds closed in 2023. Nonetheless even the results for 2023 were a substantial increase from the $22.5 billion in new assets among 340 funds closed in 2013.[7] It is notable that much of the capital raised now go to the benefit of the largest fund managers with average fund size up from approximately $80 million in 2013 to approximately $154 million in 2023. In the same vein, much of the capital raised now goes to well established funds, as capital raised by first-time funds has fallen to a seven year low, with only 117 new firms funded in 2023.[8]

**C.     Structure and Operation of Venture Capital Firms**

31.     The first venture capital firms were structured as closed end funds and were publicly traded.[9]  A closed end fund is not well suited to investment in private entities because there is a timing mismatch (the value of a private entity may not be known for years, but a closed end fund trades daily), because it is not tax efficient (many forms of income which pass through it are taxed as ordinary income at high rates to the investors instead of the lower rates available for dividends and capital gains), and because of logistical difficulties (drawdowns over time,

---

[7] National Venture Capital Association (NVCA) Q4 2023 Venture Monitor, p. 34. https://nvca.org/wp-content/uploads/2024/01/Q4-2023-PitchBook-NVCA-Venture-Monitor.pdf
[8] NVCA Q4 2023 Venture Monitor, p. 38.
[9] These are similar to, but not the same as, the more commonly encountered open-end mutual funds, chiefly because they are closed to new investment once issued and do not redeem their shares after that issuance.

realization-based fees, related party transactions, and disclosure limits about the underlying privately-held portfolio companies).[10]

32.     During the last several decades, most VC firms have organized their investment funds as non-traded limited partnerships to suit the needs of investors (especially institutional investors such as pension funds, trusts and endowments, insurance companies, banks, *etc.*), to optimize tax treatment (for both tax-exempt and tax-paying investors by avoiding double taxation of income and gains to investors—once at the corporate level and a second time at the investor level), and to deal with other logistical issues (drawdowns over time, realization-based fees, *etc.*).

33.     The typical VC fund structure outlined in a limited partnership agreement ("LPA") consists of a limited partnership in which the investors (the limited partners or "LPs") contribute funds to be overseen by the fund manager (the general partner or "GP") as those funds are invested in portfolio companies.[11]

34.     The LPs provide most of the funds to be invested and the GP provides the remaining funds: often the ratio is 99% to 1% (although the GP contribution can be larger).[12] Historically, in order to comply with US law,[13] the LPs were passive, meaning that they did not participate in the selection of companies to receive funds nor in the oversight of the companies afterward (these companies are referred to as "portfolio companies"), and the GP was active, meaning that it selected and oversaw the portfolio companies.

---

[10] Cendrowski, *op. cit.*, pp. 33-34.

[11] In describing typical PE firm structure, operations, compensation, and similar subjects I note that there are slight differences in practice among individual firms, although the basic elements are present in almost all cases.

[12] In the past, there was guidance that a GP needed to contribute at least 1% of the capital of the fund in order to be considered a "true partner" for US tax purposes and, therefore, to be eligible for capital gains tax treatment of the GP's carried interest.  See para. 39-42, below, for an explanation of carried interest.

[13] Especially the Employment Retirement Income Security Act of 1974 (ERISA).

35.     Alongside the investment fund (the "VC Fund") typically there are two additional entities: a limited partnership or limited liability company ("LLC") organized to serve as the general partner of the VC Fund (the "Fund GP")[14] and another limited partnership or LLC organized to serve as the management company (the "Fund Management Company").  The Fund GP enters into the partnership agreement with the LPs for the VC Fund and takes responsibility for managing the business of the VC Fund, such as making investment decisions about portfolio companies and retaining the Fund Management Company. In return, the Fund GP receives the carried interest from the VC Fund; typically, the Fund GP has no employees.  The Fund Management Company, after being retained by the Fund GP, handles day-to-day operations of the business, employs the individuals who perform the work, rents office space to house them, and similar things.[15]  Often, but not always, the Fund GP and the Fund Management Company are owned and controlled by the same group of individuals or entity.

36.     A typical VC firm receives at least two forms of compensation from the LPs for its activities, management fee and carried interest:[16]

    a.  The management fee usually is an amount calculated as a fixed percentage of total

        capital commitments to the VC Fund during an initial period (often called the

        'investment period') and then a fixed percentage of unrecovered capital after the

        investment period (or, sometimes a lower fixed percentage of total capital after

        the investment period).  Management fees for VC funds typically range from

---

[14] Limited partnership law requires that there be an ultimate general partner.

[15] Breslow, Stephanie R., and Phyllis A. Schwartz, *Private Equity Funds:  Formation and Operation*, 2d ed., New York, NY: Practicing Law Institute, February 2023, Release #6, § 1:2.5[A].

[16] Some PE firms, especially those participating in buyouts, also receive transaction, monitoring, and other fees.  In the past, many of these PE firms retained these additional fees, but increasingly there is pressure from LPs to rebate or credit all or part of these fees to the LPs (often by proportionally reducing the management fee).

1.5% to 2.5% of capital committed; historically, many charged 2.0%, with larger

funds often charging less than smaller funds;[17] and

b.  The carried interest usually is an amount calculated as a percentage of the profits

of the VC Fund.  Carried interest for VC funds typically ranges from 15% to 25%;

historically many were set at 20% and, in conjunction with the standard 2%

annual management fee, such arrangements commonly were referred to as '2 and

20.'[18]

**D.    Qualifications, Compensation, and Incentives for Individuals at Venture Capital Firms**

37.    Investment staff at a VC fund usually come with at least a bachelor's degree and

often a master's or more advanced degree in a relevant subject, typically from elite universities,

plus at least a decade of experience either in a related field, such as investment banking, or as a

successful entrepreneur (for example, having built and sold a sizable business). Positions at VC

firms are highly coveted because of the prestige and pay and the competition for even an entry-

level position is quite fierce; promotion to  a decision-making role is very difficult and often is

not part of the program for entry-level hires.

38.    Only the most senior investment staff at a VC fund typically have a meaningful

share of the Fund GP's carried interest as part of their compensation.  This simultaneously serves

two purposes.  One, the potential for significant gain draws bright, hardworking individuals to

---

[17] Schell, James M., Kristine M. Koren, and Pamela L. Endreny, *Private Equity Fund, Business Structure and Operations*, New York, NY: Law Journal Press, originally published 2000, updated 2023, Release 47, § 1.04[3][c].  Kocis, *op. cit.*, pp. 22-23. Ramsinghani, *op. cit.*, pp. 83-83.  Cendrowski, *op. cit.*, p. 7, provides a wider range, 1.25% to 3.0%. Typically, the management fee declines after much of the committed capital is deployed or after a period of time during which it is expected that committed capital will be deployed. Breslow, *op. cit.*, § 4:4.2[B].  Kocis, *op. cit.*, p. 22.
[18] Schell, *op. cit.*, § 1.04[3][a].  Cendrowski, *op. cit.*, p. 8. Kocis, *op. cit.*, pp. 22-23.  Ramsinghani, *op. cit.*, pp. 94-95.

the VC industry.  And two, it helps solve the so-called 'agency problem' of aligning the interests of investors and managers (that is, the 'agents' of the investors).[19]

39.     Carried interest is important to individuals in the VC industry, especially to investment staff.  The prestige of being a Managing Director or a Partner at a VC firm and/or a member of the board of directors of some of its portfolio companies is high, and the base pay and bonus from a VC fund management company can be generous by almost any standard. Nonetheless one of the main attractions of working in the VC industry always has been the opportunity to participate in carried interest payments from the fund GP.

40.     Whether a fund has a typical '2 and 20' fee structure or something different, it is the intention of the LPs and the hope of investment staff that payments from carried interest will be substantial. But in order to be eligible for such carried interest payments, investment staff must be willing to buy into the GP entity in order to provide it with capital to make its contribution toward the financings in which the fund participates (i.e., the GP's 1% stake alongside the LP's 99% stake) and they also are subject to a vesting requirement. The amount of a GP partner buy-in varies, but it often is several hundred thousand dollars or even more than a million dollars for an individual and vesting typically is at least four to five years from the time of fund formation.[20]

---

[19] Agency theory deals with the problems that exist in principal-agency relationships (such as between investors in and managers of a company) because of misaligned goals or different appetites for risk (for example, the shareholders of a company may want steady dividends whereas the managers may want to expand aggressively so that they can pay themselves more in the future).  Often in agency theory problems, there also is an asymmetry of information between the principals (investors) and agents (managers).  *See* Jensen, Michael C. and William H. Meckling, "Theory of the Firm:  Managerial Behavior, Agency Costs and Ownership Structure," *Journal of Financial Economics*, October 1976, v. 3, no. 4, pp. 305-360. "The problem of inducing an 'agent' to behave as if he is maximizing the 'principal's' welfare is quite general.  It exists in all organizations and in all cooperative efforts…."  p. 6.

[20] The GP stake in a $500 million venture capital fund is at least 1% or $5 million. If there are three GPs, that is at least $1,670,000 each. And the numbers can be considerably higher; the most recent Founders Fund raise of $3 billion involved $300 million in commitments from the firm's partners.

41.     As mentioned above, in the language of economics, the carried interest addresses part of an agency problem of the investors in a VC fund.  Because most VC funds are structured as limited partnerships, the ability of LPs to oversee and even to vote against the activities of the GP is constrained (on broad range of subjects such as portfolio company selection, raising subsequent funds, co-investment alongside other funds sponsored by the same VC firm, investment by the GP crowding out investment by LPs, reinvestment of profits, use of debt, maximum investment in one portfolio company, *etc.*).  So, it is very important to LPs that the interests of the GP be aligned with their interests.

42.     Another part of the agency problem of VC funds is addressed with covenants. For example, VC fund documents may contain contractual prohibitions against investing in foreign countries or in industries outside the stated focus of the fund or placing more than a stated percent of the fund in a single company. And almost all VC fund documents contractually empower a smaller subset of the LPs with the largest investments in the fund, often called the LP "Advisory Board" or "Advisory Committee," with delegated authority to handle a subset of issues on behalf of all of the LPs.[21]

## E.     Raising a Venture Capital Fund

43.     Most VC funds are raised for a stated duration; typically, ten years, often with options to renew for another one or two years.[22] Even though most VC funds make all of their

---

https://techcrunch.com/2020/02/19/founders-fund-confirms-3-billion-in-new-capital-across-two funds/#:~:text=An%20additional%20%24300%20million% 20in,Wall%20Street%20Journal%20last%20October. Regarding vesting see Breslow, *op. cit.*, § 6.5.5[A]. Schell, *op. cit.*, § 4.04[4].

[21] For simplicity I will follow the convention adopted by the Institutional Limited Partners Association ("ILPA")  and generally refer to a Limited Partner Advisory Committee or "LPAC" hereafter.

[22] Breslow, *op. cit.*, § 4:18.1. Cendrowski, Harry, James P. Martin, Louis W. Petro, and Adam A. Wadecki, *Private Equity: History, Governance, and Operations*, Hoboken, NJ: Wiley Finance, 2008, p. 10. Gompers, Paul A. and Josh Lerner, "An Analysis of Compensation in the U.S. Venture Capital Partnership," *Journal of Financial Economics*, January 1999, v. 51, no. 1, p. 6.  Kocis, James M., James C. Bachman IV, Austin M. Long III, and Craig J. Nickels, *Inside Private Equity: The Professional Investor's Handbook*, Hoboken, NJ: John Wiley & Sons, 2009,

initial investments in three to five years (with most having an option to extend that investment period for an additional one or two years, if necessary), the total potential holding period of 10 to 12 years is a long time to lock up funds from investors, who have other choices which can provide much more liquidity.[23]

44.     As a consequence, the due diligence scrutiny to which potential LPs subject a GP during the fund raising process is very intense, especially for a first-time fund (such as the planned New Fund). Institutional investors want to know that a prospective new fund will be run by a team (not just one individual), that the team has worked together previously, that the team has a coherent investment strategy and is responsible for several successful investments using that strategy in the past (and that there is some way of attributing that success to that team – there are many would be venture capital investors who seek to claim credit for an investment made by someone else in their organization), and that these investments produced a good investment track record (preferably top quartile). In addition, LPs also care about the current macroeconomic environment and the team's continued access to a pipeline of attractive investment opportunities.[24]

45.     As one handbook says: "Raising a new fund has never been an easy task; however, the recent popularity of well-established PE firms raising mega-follow-on funds has made such a task even harder. Investors want to see top quartile returns in previous funds and a seasoned management team with a track record of success, and they want to invest in a fund led

---

p. 16.  Ramsinghani, Mahendra, *The Business of Venture Capital Insights from Leading Practitioners on the Art of Raising a Fund, Deal Structuring, Value Creation, and Exit Strategies*, Hoboken, NJ: John Wiley & Sons, 2011, pp. 97-98. Zeisberger, Claudia, Michael Prahl, and Bowen White, *Mastering Private Equity, Transformation via Venture Capital, Minority Investments & Buyouts*, Chichester, UK: Wiley, 2017, p. 253.
    [23] Breslow, *op. cit.*, § 4:4.2. Zeisberger, *op. cit.*, pp. 9-10.
    [24] Zeisberger, *op. cit.*, p. 220.

by a PE firm with significant brand equity."[25] One source says: "Starting a VC fund is no easy feat. Even when faced with favorable macroeconomic conditions, **many of the typical sources of capital available for established VCs are essentially out of reach for first-time managers**."[26] Another source goes so far as to say, "Raising a first-time fund (even with a fully-attributable strong track record) is by no means a walk in the park. The first point to consider is that **the majority of institutional investors do not invest in first-time funds**. Hence the addressable universe of LPs shrinks significantly."[27]

46.    Setting aside this obstacle for the moment, there are some institutions which will invest in first-time funds, but the ideas and materials which must be presented to them in order to gain their support (*i.e.*, a financial commitment) are extensive. As Winter Mead, an experienced investor put it: "Raising a venture capital fund is a sales process. You are selling a financial security that is a stake in the fund…It is challenging to raise a venture capital fund. Many who start out do not actually get to the finish line."[28]

47.    Mead lists a number of documents which are "Necessary" and others which are "Nice to Have" (but nonetheless clearly important). In the first category, he places: a 'pitch deck,' which enumerates team, strategy, prior investment performance (known in the industry as a 'track record'), and investment terms; a draft limited partnership agreement ("LPA"), including a summary of terms (target fund size, strategy, industry focus, investment term, GP commitment, management fee, and carried interest).[29] In the second category, he places, an executive

[25] Cendrowski, Harry, James P. Martin, Louis W. Petro, and Adam A. Wadecki, *Private Equity: History, Governance, and Operations*, Hoboken, NJ, Wiley Finance, p. 30.
[26] Girtu, Miruna, "Starting a VC Fund: 7 Key Criteria to Consider," *Forbes*, May 19, 2020. Emphasis added. https://www.forbes.com/sites/mirunagirtu/2020/05/19/starting-a-vc-fund-7-key-criteria-to-consider/?sh=15094b713f2f
[27] Zeisberger, *op. cit.*, p. 221. Emphasis added.
[28] Mead, Winter, *How to Raise a Venture Capital Fund, The Essential Guide to Fundraising and Understanding Limited Partners*, San Francisco, CA, 2021, p. 41.
[29] *Ibid.*, pp. 43-54.

summary, a private placement memorandum, a due diligence questionnaire, and an operating manual.[30] Other sources list the same things: pitch deck, executive summary, track record, and LPA.[31]

48.     Both Mead and other experts on the subject, cover at great length the need for a detailed investment track record, including some proof of attribution for the investments to the principals of the planned new fund.[32] I know from firsthand experience meeting with potential LPs, this is the subject on which they want to spend the most time and which they will thoroughly explore.

49.     There are no shortcuts in presenting an investment track record: it must contain the name and a short description of the portfolio company, the dates and amounts invested, including detail about the security terms and valuation and information about co-investors in the round, and, if there has been an exit, details about the public offering or acquisition.[33] In addition, if the investments were made while at another organization, there must be some sort of proof of attribution, typically an attribution letter or references providing access to relevant portfolio company managers and/or co-investors in the company in question.[34]

## VI.     BACKGROUND FOR THE CASE AT HAND

### A.     Summary of Interactions Between Chang, Copeman, and Cashman

---

[30] *Ibid.*, pp. 54-60.

[31] Moore, Kevin, J., *Starting Your Own Venture Investment Fund*, Oklahoma City, 2018, pp. 27, 37, 50, and 61. Donna, Shea Tati-Di, and Kaego Ogbechie Rust, *The Venture Fund Blueprint*, Austin, TX, Houndstooth Press, Scribe Media, 2022, pp. 40-48.

[32] See the extensive work of Mathonet, Pierre-Yves, and Thomas Meyer, *J Curve Exposure: Managing a Portfolio of Venture Capital and Private Equity Funds,* Hoboken, NJ, John Wiley & Sons Ltd., 2007, pp. 191-225.

[33] It should not be necessary to say this, but it is essential to include **all** investments – both those which made money and those which lost money – in an investment track record. It is well known among institutional investors that there are more losing investments than winning investments and that the 'winners pay for the losers…and then some.'

[34] The question of attribution is large and extensively scrutinized; institutions spend a lot of time on the issue. See the lengthy description in Kocis, James M., James C. Bachman IV, Austin M. Long III, and Craig J. Nickels, *Inside Private Equity: The Professional Investor's Handbook*, Hoboken, NJ, John Wiley & Sons, 2009, pp. 165-173.

50.     In November 2019, an acquaintance introduced Stacy Chang and Tom Copeman. Chang was a former entrepreneur who was working as an executive assistant[35] at the VC firm, Founders Fund, and Copeman was an angel investor who was working with a company attempting to raise venture funding. The two corresponded and, in January 2021, Copeman introduced Chang to Carlos Cashman, the CEO of Thrasio, a company in which Copeman was an early investor. The dialog continued among the three individuals.

51.     In May 2021, Copeman mentioned to Chang that he was working with Cashman to create an investment vehicle in order to potentially raise a new VC fund and that Cashman was considering providing an anchor investment commitment of up to $10 million to assist in recruiting other investors to the potential new fund. In June 2021, Chang made a nine-page PowerPoint presentation to Copeman and Cashman with some generic observations using publicly available data about the state of the VC industry and finished with a so-called "Discussion" in which she talked about the role of a "Generalist vs. Specialist" and suggested some "Buckets of Investments."[36]

52.     This was enlarged with eight additional pages in September 2021. The contents of these new pages were mostly questions about the potential new fund's investment thesis and the investment track record of "Carlos, Tom, Stacy."[37] Nothing of substance was added to the original presentation.

53.     In October 2021, Chang put together a one-page Excel spreadsheet 'budget' for the potential new fund (by now referred to as Arrowside Ventures). It listed monthly and annual

---

[35] Her employment letter says that her title would be 'Executive Assistant,' although she has claimed that she was 'Chief of Staff.' CHANG000230. From testimony, it appears that there were several 'Chiefs of Staff,' each tasked with supporting one or more GPs or other senior partners at Founders Fund.
[36] CHANG000105-113.
[37] CHANG003372-386.

expenditures, the largest category of which in the "Fixed" category was "Payroll" at $46,875 per month or $562,500 per annum. This was a buildup of salaries of $225,000 each for Chang and Copeman, plus $60,000 to $75,000 for "Scott" and another $30,000 to $37,500 for a "Shared EA." In addition, there was an estimate of the "Variable" category with entries for meals, computers/supplies, travel, software/internal tools, accounting, and legal totaling an annual cost of $856,500. There was no attribution of any amounts to any sources and the only explained assumption indicated that the actual expenses could vary substantially from the estimated expenses; "highly variable based on external fundraise and leading deals [sic]".[38]

54.     In November 2021, Chang sent a document entitled "Carry discussion" and attached a 'model' to it. The document was a generic discussion of the two main methods that different VC firms use to calculate when GPs are eligible to collect carried interest from distributions to LPs: fund level or deal by deal.[39] The 'model' presumably was a single page Excel spreadsheet that showed the results of assuming an investment of approximately $94 million with optimistic proceeds of approximately $473 million. There was almost no explanation of the assumptions, apart from one "$2M investment example." [40]

55.     Beyond these documents, someone else did some work to develop a website for Arrowside and some Arrowside branded items, such as hats, T-shirts, and letterhead.[41]

56.     The Plaintiff played some role in connection with a number of investments made by Cashman Family Investments II, but the capital came from Cashman and the ultimate decision to invest in those companies was made by Cashman.

---

[38] CHANG000019.
[39] CHANG000114.
[40] Defendants' Exhibit 15 (no Bates number).
[41] CHANG000054-104.

57.     The Plaintiff wanted to leave Founders Fund because she did not feel like the "scope and growth" toward an investment role was there and she expressed that desire both to Copeman and to her supervisor at Founders Fund, Lauren Gross.[42]

## VII.    OPINIONS ON THE INTERACTIONS OF PLAINTIFF AND DEFENDANTS AND WHETHER THEY COULD HAVE RAISED A VENTURE CAPITAL FUND

### A.    The Interactions of Chang, Copeman, and Cashman Were Ordinary and Conformed to Custom and Practice in the Startup World and Venture Capital Business

58.     From the beginning in May 2021 to the end in December 2021, the interactions of Stacy Chang and Tom Copeman, and subsequently of Chang, Copeman, and Carlos Cashman, were entirely ordinary and conformed in all substantial ways to custom and practice in the startup world and the VC business.

59.     From the manner in which Chang and Copeman met, networking about a potential investment, to the manner in which they subsequently interacted, by exchanging ideas about the VC business, to the subsequent inclusion of a potential anchor investor, Cashman, all of it was very typical of the way in which many ideas for a new venture are hatched, analyzed, tested, and eventually pursued or discarded. I have heard a large number of entrepreneurs describe something similar to me in their 'pitch' meetings and I have seen it firsthand in some cases.

60.     In the course of this 'brainstorming,' it is customary to freely exchange ideas, analyzing and testing them from various perspectives, in the hope that something good will emerge, that the idea can attract customers and funding. Sometimes the process works, but more often it does not. When an idea emerges, gains support, and generates financial success, that is

---

[42] Deposition of Stacy Chang, September 8, 2023, 47:20-53:10.

part of the creative process of capitalism; equally, when a different idea emerges, does not gain support, and eventually succumbs, that destruction also is part of capitalism.[43]

61.     Chang had some limited experience in the VC industry and she shared what she knew with Copeman, and eventually Cashman too, in the hope that this would help create something bigger and eventually more valuable, that it would put the three of them in a position to raise capital from institutional investors.

**B.     The Potential Team Did Not Create the Marketing Materials Needed to Support Institutional Fund Raising**

62.     As was noted above, institutional investors are essential to raising a VC fund of $100 million or more, many institutional investors will not invest in a first-time fund, and those institutional investors which will invest in a first-time fund have high expectations for the potential GPs of the prospective new fund, including a seasoned management team with an investment track record of success, top quartile returns from that track record, and continuing source of high quality deal flow. If the potential GPs of a prospective new fund hope to even schedule an initial meeting with an institutional investor, they must be able to first send an executive summary which encapsulates their investment thesis, how they have worked together in the past, what sort of investment results that work has produced in the past, and how they intend to capitalize on all of that in the future. Once in the meeting itself, they must be capable of enunciating all of this clearly and succinctly, answering the very aggressive questions with which they will be peppered, and somehow differentiating themselves from the other first-time funds

---

[43] The latter is similar to, but not the same as, 'creative destruction,' which is caused by disruptive forces, such as a technological innovation (*e.g.*, electricity or the Internet), that destroy some part of the economy by superseding it.

which also are competing for the scarce time and capital of the institutional investors. It is a high bar and few succeed in clearing it.

63.     I have prepared the sorts of investment marketing materials that are expected by institutional investors and I have dealt with the sorts of institutional investors who invest in VC funds, so I am experienced in this field. I have been in marketing meetings with and raised capital from: Adams Street Partners in Chicago, IL; Caisse de Dépôt in Quebec, QC; California Public Employees' Retirement System ("CalPERS") and California State Teachers' Retirement System ("CalSTRS") in Sacramento, CA; Canada Pension Plan and Ontario Teachers' Pension Plan in Toronto, ON; Hamilton Lane Advisors in Philadelphia, PA; HarbourVest Partners in Boston, MA; Horsley Bridge Partners in San Francisco, CA; Pantheon Ventures in London, UK; Pathway Capital in Irvine, CA; Teachers' Retirement System of Illinois in Springfield, IL; and other institutional investors, plus financial intermediaries such as Cambridge Associates and Wellington Management in Boston, MA.

64.     Nothing that I saw in the communication among Chang, on one hand, and Copeman and Cashman, on the other hand, satisfied the requirements of marketing to these sorts of investors, even if one allows that some of the work still was in draft form. There was no executive summary, no pitch deck, and no track record which, in my professional opinion, would have been necessary to have allowed the potential team behind Arrowside to gain entry at institutional investors, let alone investment commitments to Arrowside. The lack of any one of these documents would have been damaging; the lack of all three would have been fatal. In my opinion, it is not merely that there were no documents with those titles that had been developed while brainstorming about Arrowside; the problem was that there had not been sufficient ideas

developed about the underlying subjects and therefore there were no documents which described those ideas.

**C.      The Potential Team Did Not Create the Investment Closing Documents Needed to Support Institutional Fund Raising**

65.      In the same vein, there were no investment closing documents prepared. The potential team of the prospective new fund had not prepared, nor had they had a law firm prepare, the essential legal documents for a new venture capital organization. There was no LPA, no subscription agreement, no GP agreement, no management company agreement, and not even a term sheet.  There were slides that mentioned a potential fee structure ('2% and 20%'), but even the fundamental question of whether to calculate carried interest on an entire fund basis or a deal-by-deal basis had not been resolved. Again, this would have been a hard stop in any discussion with potential institutional investors (and these documents cannot be prepared and reviewed in a few days either, they require weeks of work).

**D.      The Potential Team Did Not Do Any Premarketing of Arrowside to Potential Institutional Investors**

66.      Not only were there no investment marketing materials or investment closing documents prepared, but there also was no premarketing outreach to potential institutional investors. Typically, some of the prospective GPs of a planned new fund have some contacts with potential institutional investors and reach out to them informally, before the fundraising process is launched formally, in order to obtain their thoughts about the planned new fund: team, terms, target portfolio companies, size, stage and style of investment, and similar features. Because many of the preeminent institutional investors see so many prospective new funds, the staff there are able to provide helpful feedback about strategy and terms, which the prospective

GPs can incorporate in their investment marketing materials and investment closing materials—without 'wasting a bullet' by launching formal fundraising too soon.

### E. The Second Half of 2021 Was a Poor Time to Launch a New Fund in the Face of Declining Market Conditions

67.     While 2021 began robustly for venture capital fundraising (*i.e.*, new capital for venture capital funds) and venture capital investment (*i.e.*, new capital for portfolio companies), the market peaked that year for first-time fund managers and began to turn down. US venture capital funds raised a total of $169.2 billion in 2021, $172.8 billion in 2022, and $66.9 billion in 2023. But the number of new funds which held a closing declined from 1,543 in 2021 to 1,340 in 2022 to 474 in 2023, as capital was concentrated in the hands of a smaller number of large, more experienced managers.[44] That is shown by the fact that first-time funds closed on $22.0 billion in 2021 but that total fell to $10.8 billion in 2022 and $7.8 billion in 2023, with the number of new first-time funds which held a closing declining even more sharply from 409 to 310 to 117 over the same period—the lowest dollar amount since 2017 and the lowest number of first-time funds since 2013.[45] "The activity suggests that investors are less willing to take gambles on new managers without historical track records or go through the costly exercise of performing due diligence on new firms."[46]

68.     The percentage of capital committed to VC funds sponsored by first-time fund managers has been falling for much of the past decade. As noted above, 2021 was a record year for VC fundraising, but only 5.7% of the total capital raised went to first-time fund managers,

---

[44] Pitchbook / National Venture Capital Association, "Venture Monitor: Q4 2023," p. 37. https://nvca.org/wp-content/uploads/2024/01/Q4-2023-PitchBook-NVCA-Venture-Monitor.pdf
[45] *Ibid.*, p. 38.
[46] Navas, Max, "Estimating US VC First-Time Manager Dropouts," Pitchbook, February 16, 2024, p. 2. https://files.pitchbook.com/website/files/pdf/Q1_2024_PitchBook_Analyst_Note_Estimating_US_VC_First-Time_Manager_Dropouts.pdf

including those with experience at established investment firms.[47] And conditions have only grown worse since then: "[2023] will be the worst year for emerging manager fundraising in more than a decade."[48]

69.    "And success for first-time funds is becoming rarer. Since 2014, fewer funds have performed (annualized IRR) above the median universe return. For first-time fund vintages between 2010 and 2015, about 20% of their peers performed above the median of the respective vintage. More recently, however, fewer than 10% of 2019 vintages have performed above the median as more seasoned managers outperformed."[49]

70.    Even if the potential Arrowside team had prepared adequate investment marketing materials and investment closing materials, the potential team did not schedule any meetings with potential institutional investors in 2021 (and institutional investors are reluctant to schedule meetings with new potential fund managers during the holiday season at the end of the calendar year), so this would have meant that the potential team from Arrowside would have been making presentations, dealing with due diligence queries, and attempting to negotiate a first closing with institutional investors during 2022. In fact, it can take as long as 12 to 18 months to market, document, and close a first-time fund[50] and conditions in the VC funding market steadily deteriorated as 2022 progressed. In fact, 2023 was even worse than 2022, with a total of only

[47] Zhang, Hannah, "First-Time Funds Are Struggling To Raise Capital," *Institutional Investor*, November 11, 2022. https://www.institutionalinvestor.com/article/2bstleyd0am2nu8i69ekg/portfolio/first-time-funds-are-struggling-to-raise-capital

[48] Matthews, Jessica, "Raising a first-time fund? This is the worst time to do it in 10 years," *Fortune*, August 10, 2023. https://fortune.com/2023/08/10/worst-year-for-emerging-manager-fundraising/

[49] McGrath, Charles, "First-time funds struggle for survival," Prequin blog, November 9, 2022. https://www.preqin.com/insights/research/blogs/first-time-funds-struggle-for-survival

[50] Wheater, Jenny, "Private Equity Fund Timeline," presentation by DuaneMorris, August 2014. https://www.duanemorris.com/site/static/private_equity_fund_timeline.pdf In a presentation by a new fund, Black Opal Ventures, one of the founding partners mentioned that the team talked to more than 500 potential investors to raise $58 million for a closing in February 2022 and that it is a process that takes many months of calling and meeting. https://www.affinity.co/webinar/fundraising-best-practices-with-isomer-capital-black-opal

$66.9 billion raised by 474 funds, a more than 60% decline year-over-year, and only $7.8 billion going to 117 first time funds, the lowest number in 20 years.[51]

71.     This downturn in institutional investor participation in new VC funds was caused by a number of factors. Not only was there an increase in interest rates precipitated by the Federal Reserve Bank raising the federal funds rate during the same period, which made traditional investments such as bonds and publicly traded stocks more attractive. But there also had been faster-than-usual VC fundraising during 2021 and since then a decline in liquidity as market conditions have made it more difficult for VC funds to arrange profitable exits (sales or public offerings) for their portfolio companies. As a consequence, VC funds have cut back distributions to LPs constraining the ability of LPs to commit to new funds.[52]

### F.     A Large Number of First-time Funds Are Unsuccessful

72.     Historically, it is well known in the VC and institutional investor communities that a large number of planned first-time funds are unsuccessful at raising enough capital to hold a closing. While there are no data on how many first-time funds actually begin the fundraising process, but then drop out because they cannot get to a first close, there are data about how many second-time funds begin the fund-raising process and are unsuccessful. And it is reasonable to infer from those data that the dropout rate for first-time funds is even higher because raising a first-time fund is more difficult than raising a second-time fund.

73.     "Historically, 63.0% of first-time managers were able to raise a second fund. However, a blend of factors, including the surplus number of first-time funds closed, the swell

---

[51] Pitchbook / National Venture Capital Association, "Venture Monitor: Q4 2023," pp. 38-39. https://files.pitchbook.com/website/files/pdf/Q4_2023_PitchBook-NVCA_Venture_Monitor.pdf
[52] Gao, Kaidi, "US VC Fundraising from an LP Perspective," Pitchbook, February 5, 2024, p. 2. https://files.pitchbook.com/website/files/pdf/Q1_2024_PitchBook_Analyst_Note_US_VC_Fundraising_From_an_LP_Perspective.pdf

and expeditious freefall of valuations, and the difficult fundraising environment, will likely diminish the success of managers raising their sophomore funds."[53] If only 63% of first-time managers reached a second close in the past and it is estimated that less than 50% of them are likely to reach a close because of worsened conditions in the current environment, then it is reasonable to infer that only a small percentage of new managers of funds would be able to close a first-time fund. [54]

### First-time VC managers that raised a second VC fund as a share of all first-time VC managers



Source: PitchBook • Geography: US • *As of December 31, 2023

74.    Furthermore, even if a first-time fund reaches a successful close, "data clearly show that the median size of a first-time fund is largely suboptimal…roughly $24 million in the US."[55] A 2.0% annual management fee on a $24 million fund is only $480,000 per year, less

[53] Navas, *op. cit.*, p. 4.
[54] Mowry, Robert, "Pitchbook Estimates That 50% of First-time Fund Managers Won't Secure a Second Fund," blog post, February 19, 2024. https://www.lafund.com/p/understanding-the-challenges-of-first
[55] Guida, Palol, "The (Almost) Mission Impossible of Raising a First-Time Fund," *Forbes*, March 22, 2021. https://www.forbes.com/sites/forbesfinancecouncil/2021/03/22/the-almost-mission-impossible-of-raising-a-first-time-fund/?sh=7a1b84b44052

than the expenses modeled by the Plaintiff in her one page 'budget' and not enough to sustain the potential Arrowside team.[56]  In fact, the so-called 'budget' was so simplistic that it failed to include essential items, expenses which any VC fund must shoulder no matter how large or small, such as audit fees.[57] The skeletal outline which the Plaintiff produced was neither detailed enough nor large enough to satisfy the requirements of potential institutional LPs and certainly not something on which she reasonably could have relied in terminating her employment with Founders Fund and expecting Arrowside to put her on its payroll instead.

**G.     Based On the Lack of Preparation and Declining Market Conditions the Potential Team Could Not Have Raised a Fund in 2021 or 2022**

75.     Because the potential Arrowside team had not prepared investment marketing materials or investment closing materials, had not had even preliminary discussions with some potential institutional investors, faced declining market conditions to raise a new venture capital fund, and because many first-time fund managers are unsuccessful, it is my professional opinion that potential Arrowside team could not have raised a venture capital fund in 2021 or 2022.

**VIII.   OPINIONS ON THE PLAINTIFF'S TERMINATION OF HER EMPLOYMENT AND HER DAMAGES CLAIMS**

**A.     Plaintiff Unreasonably Terminated Her Employment Before Arrowside Was Even Ready to Begin Marketing Let Alone Hold a First Close**

76.     

---

[56] CHANG000019.
[57] There was an entry for "Accounting," but this was $2,500 per month, which meant it was internal bookkeeping, not external audit.

[redacted]

77. The Plaintiff had stated that she felt her position at Founders Fund was a dead end, because the firm had told her several times that it would not promote her from a support role to an investment role. It seems more likely than not that she would have left Founders Fund even if she had not been involved in brainstorming about Arrowside with Copeman and Cashman.

**B. Plaintiff is Not Entitled to Wages or Other Compensation for Any Work That She Did in Connection With Discussing or Planning Arrowside**

78. The Plaintiff seems to claim that she is entitled to wages or some other sort of compensation for her participation in the discussion about a potential new fund with Copeman and eventually with Copeman and Cashman. The sort of discussion in which she participated and even the bit of work that she did, such as putting together small slide decks or a one-page budget, sourcing a few potential deals, or looking over Cashman's personal investments in some startup companies, was typical of new venture brainstorming. If Arrowside had gone forward and eventually been put in operation, and Plaintiff was placed in a partnership position, then perhaps the Plaintiff would have been more than adequately compensated with a salary and carried interest.[60] But, as is not untypical of such early stage brainstorming, the plans did not come to

---

[58] [redacted]

[59] Chang, 141:6-10. The Plaintiff did not seem to understand that having one party ask for a concession by the other party during discussions does not mean that the parties have concluded an agreement.

[60] "Co-founders may or may not get paid, depending on the stage of the startup and the agreement between the co-founders. In the early stages, co-founders may not receive any salary, but they may get equity in the company." Founders Network, "Founder Dating Ultimate Guide: Finding Your Perfect Co-Founder," blog post, https://foundersnetwork.com/blog/founder-dating/

fruition and the Plaintiff's 'sweat equity' was worth nothing—as was the 'sweat equity' of Copeman and Cashman.

79.     Furthermore, the bit of work which the Plaintiff did perform as part of her brainstorming about Arrowside was not of sufficiently high quality in order to have a reasonable prospect of arranging productive meetings with and obtaining investment commitments from prospective institutional investors.

**C.      Plaintiff is Making Outsized Claims of Financial Losses in Connection with Possible Carried Interest Payments**

80.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

81.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

61 ████████████████████████████████████
62 ████████████



82. <span style="background:black;color:black">████████████████████████████████████</span>



---



This Expert Report presents my opinions based on the facts of which I was aware at time of its preparation. My opinions are subject to revision in light of additional facts that are presented before the date of trial.

Signed April 8, 2024



Jim Timmins, ASA

*PRIVILEGED & CONFIDENTIAL/ATTORNEY WORK PRODUCT*

**APPENDIX A - Curriculum Vitae of Jim Timmins**

# Jim Timmins, ASA BV/IA, MAFF, CEP
**Managing Director**
**Spring Canyon Litigation Services, Inc.**
3280-55A Tamiami Trail, # 120
Port Charlotte, FL 33952-8086
jtimmins@sclsinc.com
650.954.4307

# General Qualifications

I have spent 40 years working with companies, as an investment banker, a venture capitalist, and an expert witness.

I have been retained as an expert in connection with more than 70 cases, by both plaintiffs and defendants, in California Superior Court, Delaware Chancery Court, Florida Circuit Court, Massachusetts Superior Court, New York Supreme Court, Rhode Island Superior Court, Texas State Court, Federal District Court (Districts of Delaware, Northern California, Southern California, and Southern New York), Bankruptcy Court, Court of Federal Claims, and Tax Court, plus specialized venues such as the Copyright Royalty Board, FINRA, International Court of Action, and private mediation and Action through AAA and JAMS.  I have prepared Expert Reports and Expert Reports, been deposed, and given testimony in bench and jury trials and before single and multiple mediators and arbitrators, plus I have consulted on a variety of related subjects.

I have been retained as an expert by a variety of technology companies, including Hewlett-Packard, Intel, Palo Alto Networks, Stitch Fix, Tech Mahindra, Tesla Motors, and Waymo/Google; I also have been retained by Citigroup, Wells Fargo, SRS Acquiom, and a number of venture capital and other private equity firms, plus the Internal Revenue Service.

I served as Special Discovery Master in Delaware Chancery Court for a complex telecommunications case, *In re Cellular Telephone Partnership Litigation*, involving a dozen mobile phone partnerships and AT&T.

The subject matter of litigation has included:  business damages, business valuation, management, director, and partner compensation and equity incentives, fairness, fiduciary duty, intellectual property valuation, legal malpractice, lost profits, reasonable royalty, transfer pricing, investment banking practice including offerings, mergers, and acquisitions, venture capital and private equity practice, and similar matters.

I have worked with companies in a wide range of industry sectors, including:  biotech and pharmaceuticals, entertainment and gaming, financial services, healthcare,

information technology, Internet services, renewable energy, and telecommunications, plus venture capital and private equity firms.

I am an Accredited Senior Appraiser in both business valuation and intangible asset valuation, a Master Analyst in Financial Forensics in business and intellectual property damages, and a Certified Equity Professional in equity compensation.

# Work Experience

<u>Investment Banking, 1981-1990 and 2005-2008</u>

I began my career in 1981, as an investment banker at Salomon Brothers ("Salomon") in New York, NY, and San Francisco, CA.  I was part of a team working on corporate finance or merger and acquisition ("M&A") assignments for a variety of companies, including Advanced Micro Devices, Amfac, Bank of America, Bank of California, Bancorp Hawaii, Chrysler, Collagen, Crown Zellerbach, Georgia Pacific, Hewlett-Packard, Natomas, Ramada Inns and Tropicana Casinos, Sherwin Williams, Simpson Timber, and Varian Associates.

In 1984, I helped form a firm, McKewon & Timmins ("M&T"), in San Diego, CA.  I was a managing director, heading a team working on corporate finance and M&A assignments for a variety of companies, including CMS Enhancements (public), IDB Communications (public and later acquired by MCI), Immunetech Pharmaceuticals (acquired by Dura Pharmaceuticals), and Precision Aerotech (public and later acquired by General Dynamics).

In 1987, I was a principal at Hambrecht & Quist ("H&Q") in San Francisco, CA.  I managed a capital markets team and worked on corporate finance and M&A assignments for a variety of companies including Actel (public and later acquired by Microsemi), Aspect Telecommunications (public and later acquired by Concerto), Dreyer's Grand (public and later acquired by Nestle), Integrated CMOS (acquired by Toshiba), Lattice Semiconductor (public and later acquired by Canyon Bridge Capital), Novellus Systems (public and later acquired by Lam Research), Octel Communications (public and later acquired by Lucent), Parametric Technology (public), Ramtron (public and later acquired by Cypress Semiconductor), Seeq (public and later acquired by LSI Logic), Sunward Technology (public and later acquired by Read-Rite), Vitelic (merged with Mosel), and Westwood One (public and later acquired by CBS).

In 2005, after 15 years in venture capital, I returned to working in investment banking as a managing director at Pagemill Partners ("Pagemill").  I assisted with M&A for a variety of companies including Comarco (unit acquired by Ascom), Delphi Automotive (unit acquired by Wireless Matrix), Justsystems (purchased XMetaL), Inovys (acquired by Verigy), and SensArray (acquired by KLA-Tencor).  I began to work extensively in valuation during this time.

Venture Capital, 1990-2005

From 1990 to 1998, I worked in venture capital at Glenwood Ventures and Glenwood Capital ("Glenwood").   I was a partner and made investments in a variety of companies including Artios (acquired by Barco), Iwerks Entertainment (public and later merged with SimEx), Magellan (acquired by Orbital Sciences), Mattson Technology (public), Micronics (public and later acquired by Diamond Multimedia), Microtec (public and later acquired by Mentor Graphics), OrCAD (public and later acquired by Cadence Design), Paradigm Technology (public and later merged with IXYS), and Spea Software (acquired by Diamond Multimedia).

From 1998 to 2005, I continued to work in venture capital at The Daiwa Securities Group, NIF Ventures ("NIF").  I was a managing director and made investments in a variety of companies including AccessLan (acquired by Advanced Fibre Communications), Active Software (public and later acquired by webMethods), Ancore (acquired by OSI Systems), Backweb (public), CrossLogix (acquired by BEA Systems), Digital Island (public and later acquired by Cable & Wireless), enCommerce (acquired by Entrust), Knova (public and later acquired by Consona), NetContinuum (acquired by Barracuda Networks), Spectra Switch (acquired by Xtellus), WaveSplitter (private), Whistle Communication (acquired by IBM), Websense (public and later acquired by Raytheon), and Vpacket (acquired by Zhone Technology now Dasan Zhone Solutions and public).

Valuation, 1981-present

I have been dealing with the subject of valuation throughout my career as an investment banker, venture capital investor, and valuation expert.  As an investment banker at Salomon and H&Q, I prepared many valuations and fairness opinions.  And as a venture capitalist at Glenwood and NIF, I participated in the valuation of companies at investment and sale.

In 2005, when I joined Pagemill, I began to work more extensively as a valuation expert, participating in approximately 200 valuations and fairness opinions.  I founded my former firm, Teknos Associates ("Teknos"), in 2008 to work full time on valuation and transaction advisory projects.  Since then I have participated in more than 3,000 additional valuations and fairness opinions, both for companies themselves and for venture capital and private equity firms which invest in them, and also for a variety of tokens and cryptocurrencies such as Bitcoin, Ethereum, and XRP.

Notable companies for which I have provided valuation or fairness support included:  A10 Networks (public), AcelRx (public), Adaptive Insights (acquired by Workday), Adynxx (merged with Alliqua BioMedical and public), Alder Biopharmaceuticals (public and later acquired by Lundbeck), Algotochip (acquired by Nitto Denko), All Covered (acquired by Konica Minolta), Altiscale (acquired by SAP), Ambarella (public), Amber Road (public), Anthera Pharmaceuticals (public), Apptus (acquired by Thoma Bravo), Aquinox Pharmaceuticals (public), Auditude (acquired by Adobe), AuthenTec (public and later

acquired by Apple), Avi Networks (acquired by VMware), Barefoot Networks (acquired by Intel), Barracuda Networks (public), Beyond Meat (public), Beyondcore (acquired by Salesforce.com), Bill.com (public), BioAmber (public), Blue River (acquired by John Deere), Boom, BrightRoll (acquired by Yahoo!), Bromium (acquired by HP), Capnia (public), Carbon 3D, Catalina Marketing (public), Centillium (acquired by TranSwitch), Chestnut Medical (acquired by ev3), CliQr (acquired by Cisco Systems), Coveo (public), Crowdstrike (public), Curbside (acquired by Rakuten), Cyphort (acquired by Juniper Networks), Databricks, DeNA (public), eASIC (acquired by Intel), Edison Pharmaceuticals (acquired by PTC Therapeutics), Elastic (public), Elastica (acquired by Blue Coat), Eiger BioPharmaceuticals (public), Esna (acquired by Avaya), Exagen (public), Expensify (public), FutureAdvisor (acquired by BlackRock), Funzio (acquired by Gree), Harmonic (public), Honest Company (public), Host Analytics (acquired by Vector Capital), Hyperion Therapeutics (public and later acquired by Horizon Pharma), Ikaria Pharmaceuticals (acquired by Mallinckrodt), Inphi (public), InQuira (acquired by Oracle), IntoNow (acquired by Yahoo!), JustFab, Link_A_Media (acquired by Hitachi), MarketRx (acquired by Cognizant), Maxygen (public), Merchant e-Solutions (acquired by Cielo), Meru Networks (public and later acquired by Fortinet), MobileIron (public), MongoDB (public), MoPub (acquired by Twitter), Mulesoft (public and later private again), Nanosys, Nature's Products, Niara (acquired by Hewlett-Packard Enterprise), Nutanix (public), Olema Pharmaceuticals (public), Ooma (public), ParkJockey, Planful (fka Host Analytics, acquired by Vector Capital),  Postmates (acquired by Uber), Precision BioSciences (public), Procore Technologies, PSS Systems (acquired by IBM), Qualys (public), Quora, RealAge (acquired by Hearst), Ripple Labs (and its cryptocurrency XRP), Roblox (public), Savvion (acquired by Progress Software), SayNow (acquired by Google), Scopley, Securent (acquired by Cisco), ServiceMax (acquired by GE), Sila Nanotechnologies, Sinochem (public), Siperian (acquired by Informatica), Snowflake (public), Stratalight (acquired by Opnext), Techwell (public, then acquired by Intersil), T2 Biosystems (public), Thumbtack, Treasure Data (acquired by ARM), Tremor Media (public), Trip.com (acquired by Ctrip), Twilio (public), Udemy, Ultragenyx Pharmaceuticals (public), Uptake Networks (acquired by Groupon), UserTesting (public), Virsto (acquired by VMware), VistaGen (public), Vudu (acquired by Walmart), WatchWith (acquired by Comcast), WideOrbit, Xamarin (acquired by Microsoft), Xenon Pharmaceuticals (public), YuMe (public), Zoox (acquired by Amazon), Zscaler (public), and Zymeworks (public). I also have provided valuations of several dozen private equity funds, management companies, and general partner stakes.

## Investing and Boards of Directors

During my career, I have evaluated many hundreds of private companies for private financing, public financing, or M&A.  I have participated in more than 100 private financing transactions, more than 50 public financing transactions, and more than 30 M&A transactions.  I have been a member of the board of directors, audit committee, and/or compensation committee of more than 15 private and public companies. I currently am a member of the board of directors of a 460 bed non-profit hospital.

I have been involved in all stages of company life, from start-up through initial public offering or acquisition, and in most aspects of early stage company development, including strategic planning, management recruiting, market, technology, and intellectual property evaluation, corporate partnering, fund raising, and M&A.  I have been involved in analysis, structuring, valuation, and due diligence review of all aspects of deals, both on behalf of companies themselves and on behalf of venture capital or private equity firms investing in them.  And I participated in determining appropriate compensation and equity incentives for management, directors, and partners.

I have extensive experience in transactions, including debt and equity financings, mergers, acquisitions, and spin-offs.  I have been involved in deal marketing (private and public, domestic and foreign), terms negotiation (non-disclosure, no shop and go shop, break up, representations and warranties, indemnification, etc.), transaction structuring (stock or asset, escrow, earnout, etc.), due diligence review, and closing.

## Teaching, Speaking, Publication, and Consulting

I have been a guest lecturer about technology company and venture capital transactions at the: Berkeley School of Law and Haas School of Business, University of California at Berkeley; School of Law, Santa Clara University; Graduate School of Business, Stanford University; and Wharton School, University of Pennsylvania.  I have been an instructor for the Practicing Law Institute ("PLI"), teaching continuing education programs for lawyers about term sheet negotiation.  And I have been a speaker about other technology company and venture capital issues at numerous conferences and industry associations in the US and abroad.

I annually contributed to the PLI publication series, "Doing Deals:  Understanding the Nuts and Bolts of Transactional Practice" (later renamed "Doing Deals:  Keeping Pace with a Rapidly Changing Market") from 1998 to 2004.

## Education and Accreditation

I hold a BA from Trinity College, University of Toronto, and a MBA from the Graduate School of Business, Stanford University.

I have earned the designations, Accredited Senior Appraiser in both Business Valuation and Intangible Assets ("ASA BV/IA") from the American Society of Appraisers, Master Analyst in Financial Forensics ("MAFF") in Business and Intellectual Property Damages, from the National Association of Certified Valuators and Analysts, and Certified Equity Professional ("CEP"), from the Certified Equity Professional Institute of Santa Clara University.

## Court Appointment

I was appointed to serve as Special Discovery Master in Delaware Chancery Court for the consolidated action, *In Re Cellular Telephone Partnership Litigation*, involving a dozen limited partnerships and AT&T (2016). In the course of my investigation, I took the sworn testimony of more than 15 AT&T executives, reviewed a dozen outside appraisals, and prepared a report that was adopted by the Court.

## Expert Witness Testimony

The cases in which I have testified during the last 10 years include:

- *In re Trados Shareholder Litigation* (Delaware Chancery Court, on behalf of SDL/Trados, retained by Wilson Sonsini Goodrich & Rosati, 2013)**
- *Iguaçu v. Cabrera* (Federal District Court, on behalf of Cabrera, retained by K&L Gates, 2013)***
- *Amazon.com v. Commissioner* (United States Tax Court, on behalf of the Internal Revenue Service, retained by US Treasury, 2013)***
- *White Oak v. Duff and Dowling* (binding civil Action, on behalf of Duff and Dowling, retained by Keker & Van Nest, 2013)***
- *Miller v. Peterson* (California Superior Court, on behalf of Miller, retained by Biggs Law Offices, 2013)***
- *Patterson v. Geico* (binding civil Action, on behalf of Geico, retained by Edrington Schrimer & Murphy, 2013)***
- *Entelos Creditors Committee v. Goggin, et al.* (Federal District Court, on behalf of the Creditors Committee, retained by Goodin MacBride Squeri Day & Lamprey, 2013)**
- *In re Marriage of Richardson* (California Superior Court, Family Division, to value Vibrant Technology, 2013)***
- *Shareholder Representative Services (obo Solaicx Securityholders) v. SunEdison (fka MEMC Electronic Materials)* (binding civil Action, on behalf of Shareholder Representative Services, retained by Durie Tangri, 2014)***
- *Newell, et al. v. YapStone, Golis, et al. (*California Superior Court, on behalf of Newell, retained by Valorem Law Group, 2014)**
- *Pillsbury v. Bewley, Stratvue, South Milhausen, Popper, et al.* (Florida Circuit Court, on behalf of South Milhausen and Popper, retained by Grower Ketcham, 2014)***
- *Mulligan v. Goldman and Relationship Science* (binding civil Action, on behalf of Goldman and Relationship Science, retained by Wilson Sonsini Goodrich & Rosati, 2015)**
- *Backflip Software v. Cisco Systems, et al.* (California Superior Court, on behalf of Backflip Software, retained by Hosie Rice, 2015)**
- *Zilincik, et al. v. Tesla Motors* (California Superior Court, on behalf of Tesla Motors, retained by Morrison & Foerster, 2015)***
- *Meister et al. v Mensinger et al.* (California Superior Court, on behalf of Meister, retained by Baker & McKenzie, 2016)***

- *Davidson v. United States of America and United States Postal Service* (Court of Federal Claims, on behalf of Davidson, retained by Pisanelli Bice, 2016)***
- *Second Measure v. Kim* (Federal District Court, on behalf of Second Measure, retained by Dhillon Law Group, 2016)**
- *In re Determination of Royalty Rates and Terms for Making and Distributing Phonorecords* (Copyright Royalty Board, on behalf of National Music Publishers Association and the Nashville Songwriters Association, retained by Pryor Cashman, 2016)***
- *JHB Ventures et al. v. Lee* (California Superior Court, on behalf of JHB Ventures, retained by Keker Van Nest & Peters, 2017)***
- *Waymo v. Uber Technologies, et al.* (Federal District Court, on behalf of Waymo (Aphabet/Google), retained by Quinn Emanuel Urquhart & Sullivan, 2017)**
- *Vigdor et al. v. Super Lucky Casino* (Federal District Court, on behalf of Super Lucky Casino, retained by Keker Van Nest & Peters, 2018)**
- *Wynnchurch Management v. Kirson, et al.* (binding civil Action, on behalf of Wynnchurch Management, retained by Quinn Emanuel, 2018)***
- *Bijou v. Cuff, et al.* (binding civil Action, on behalf of Bijou, retained by Kyle Law, 2018)***
- *WonderWorks v. Hewlett-Packard, et al.* (California Superior Court, on behalf of Hewlett-Packard, retained by Baker McKenzie, 2018)***
- *Northgate Financial Partners v. Tech Mahindra* (binding civil Action, on behalf of Tech Mahindra, retained by Reed Smith, 2018)***
- *FXOne LLC and Ingargiola v. Seabury Financial Services et al.* (binding civil Action, on behalf of the plaintiffs, retained by Hughes Hubbard & Reed, 2019)***
- *Md Anis Uzzaman and Fenox Venture Capital v. Hill et al.* (California Superior Court, on behalf of Hill, retained by Minami Tamaki, 2019)**
- *ICONIQ v Boeding* (binding civil Action, on behalf of claimant, retained by Goodwin Procter, 2020)***
- *Citigroup Global Markets, et al. v. SCIP Capital Management and Silverfern Group*, (New York Supreme Court, on behalf of plaintiffs, retained by Dewey Pegno & Kramarsky, 2022)**
- *Zhang, Xia, et al. v. Wang, Jin, et al.*, (binding civil Action, on behalf of respondents, retained by Keker Van Nest & Peters, 2022)**
- *AllRounds v. Carta and DFJ, et al.*, (Federal District Court, on behalf of plaintiff, retained by Kirkland & Ellis, 2022)**
- *Sorrento Therapeutics, et al. v. Miao and Chen, et al.*, (California Superior Court, on behalf of plaintiffs, retained by Latham & Watkins, 2022)**
- *Poirson v. Matilock, MetaMap, et al.*, (Federal District Court, on behalf of plaintiff, retained by Affeld Grivakes, 2023)**
- *Manti Holdings, et al. v. The Carlyle Group, et al.*, (Delaware Chancery Court, on behalf of plaintiffs, retained by Squire Patton Boggs, 2023)***
- *Schwaber v. Margalit, Jerusalem Venture Partners, et al.* (binding civil Action, on behalf of plaintiff, retained by Glenn Agre Bergman & Fuentes, 2023)***
- *Abu-Haimed, et al. v. XPENG, XMOTORS.AI, et al.*, (California Superior Court, on behalf of plaintiffs, retained by Greenspoon Marder, 2023)**

- *Reynosa, et al. v. Centerpiece LLC, et al.* (California Superior Court, on behalf of plaintiffs, retained by Dyson Law Offices, 2023)**
- *Solaia Capital Management LLC v. Kairos Manford Private Equity fund I LP, et al.* (California Superior Court, on behalf of plaintiff, retained by Blank Rome, 2023)***
- *Shareholder Representative Services (obo Freshly Securityholders) v. Nestlé, et al.* (Delaware Chancery Court, on behalf of plaintiff, retained by Goodwin Procter, 2023)
- *Ever.Ag v. Milk Moovement*, (Federal District Court, on behalf of plaintiff, retained by Wilkie Farr & Gallagher, 2024)
- *Chang v. Cashman, Arrowside Capital, LLC, Arrowside Fund GP, Arrowside Ventures, LLC, and Cashman Family Investments II, LLC* (Federal District Court, on behalf of defendants, retained by Morgan Brown & Joy, 2024)

_____

**Deposition   ***Trial or arbitration hearing

**APPENDIX B – Documents Relied Upon**

Pleadings

Plaintiff's Expert Witness Designation

Second Amended Complaint

Depositions

Deposition of Carlos Cashman, September 7, 2023

Deposition of Stacey Chang, September 8, 2023

Deposition of Thomas Copeman, November 9, 2023

Deposition of Lauren Gross Bernstein, January 25, 2024

Documents

CHANG000230

CHANG000105-113

CHANG003372-386

CHANG000019

CHANG000114

CHANG000054-104

FF_CHANG-0000042-042

Defendants' Exhibit 15 in Deposition of Stacy Chang, 273-376 (no Bates number, described as "economic model")

**APPENDIX C- Works Utilized**

<u>Books and Reports</u>

Ante, Spencer E., *Creative Capital: Georges Doriot and the Birth of Venture Capital*, Boston, MA, Harvard Business Press, 2008.

Bagley, Constance E., and  Craig E.  Dauchy, *The Entrepreneur's Guide to Business Law*, 11th ed., Eagen, MN, West Publishing, 1997.

Breslow, Stephanie R., and Phyllis A. Schwartz, *Private Equity Funds:  Formation and Operation*, 2d ed., New York, NY, Practicing Law Institute, originally published 2016, updated through 2022, Release 5.

Bygrave, William D., and Jeffry A. Timmons, *Venture Capital at the Crossroads,* Boston, MA, Harvard Business School Press, 1992.

Cendrowski, Harry, James P. Martin, Louis W. Petro, and Adam A. Wadecki, *Private Equity: History, Governance, and Operations*, Hoboken, NJ, Wiley Finance.

Donna, Shea Tati-Di, and Kaego Ogbechie Rust*, The Venture Fund Blueprint*, Austin, TX, Houndstooth Press, Scribe Media, 2022.

Finkel, Robert A., and David Greising, *The Masters of Private Equity and Venture Capital: Management Lessons from the Pioneers of Private Investing,* New York, NY, McGraw-Hill, 2009.

Fraser-Sampson, Guy, *Private Equity as an Asset Class*, 2d ed., Hoboken, NJ, John Wiley & Sons, 2010.

Gompers, Paul A., and Josh Lerner, *The Venture Capital Cycle*, Cambridge, MA, MIT Press, 2000.

Klonowski, Darek, *The Venture Capital Investment Process*, New York, NY, Palgrave Macmillan, 2010.

Kocis, James M., James C. Bachman IV, Austin M. Long III, and Craig J. Nickels, *Inside Private Equity: The Professional Investor's Handbook*, Hoboken, NJ, John Wiley & Sons, 2009.

Lerner, Josh, Felda Hardymon, and Ann Leamon. *Venture Capital and Private Equity: A Casebook.* 4th ed. Hoboken, NJ: John Wiley & Sons, 2008.

Levin, Jack S. and Martin D. Ginsburg, *Structuring Venture Capital, Private Equity, and Entrepreneurial Transactions,* 2001 ed., Gaithersburg, MD, Aspen Pub., 2001.

Lord, Hambleton and Christopher Mirabile, *Venture Capital, A Practical Guide to Fund Formation and Management*, Boston, MA, Seraf Compass Publishing, 2018.

Mathonet, Pierre-Yves, and Thomas Meyer, *J Curve Exposure: Managing a Portfolio of Venture Capital and Private Equity Funds,* Hoboken, NJ, John Wiley & Sons Ltd., 2007.

Mead, Winter, *How to Raise a Venture Capital Fund, The Essential Guide to Fundraising and Understanding Limited Partners*, San Francisco, CA. 2021.

Meyer, Thomas and Pierre-Yves Mathonet, *Beyond the J-curve, Managing a Portfolio of Venture Capital and Private Equity Funds,* Hoboken, NJ, John Wiley & Sons, 2007.

Moore, Kevin J., *Starting Your Own Venture Investment Fund*, Oklahoma City, OK, 2018.

Mowry, Robert, "Pitchbook Estimates That 50% of First-time Fund Managers Won't Secure a Second Fund," blog post, February 19, 2024. https://www.lafund.com/p/understanding-the-challenges-of-first

Ramsinghani, Mahendra, *The Business of Venture Capital Insights from Leading Practitioners on the Art of Raising a Fund, Deal Structuring, Value Creation, and Exit Strategies*, 2d ed., Hoboken, NJ, John Wiley & Sons, 2011.

Schell, James M., Kristine M. Koren, and Pamela L, Endreny, *Private Equity Fund, Business Structure and Operations*, New York, NY: Law Journal Press, originally published 2000, updated through 2022, Release 45.

Wheater, Jenny, "Private Equity Fund Timeline," presentation by DuaneMorris, August 2014. https://www.duanemorris.com/site/static/private_equity_fund_timeline.pdf

Wilmerding, Alex, *Term Sheets & Valuations, A Line by Line Look at the Intricacies of Term Sheets & Valuations*, 1st ed., Eagen, MN, Thomson Reuters / Asporte, 2006.

Zeisberger, Claudia, Michael Prahl, and Bowen White, *Private Equity: Transformation via Venture Capital, Minority Investments & Buyouts*, Hoboken, NJ, John Wiley & Sons, 2017.

Articles and Publications

CFA Institute, "Private Equity Investments," 2023 Curriculum.

Cumming, Chris, "Private-Equity Fundraising Blues Weigh Heavily on Newer Managers," *Wall Street Journal*, May 25, 2023. https://www.wsj.com/articles/private-equity-fundraising-blues-weigh-heavily-on-newer-managers-214f6af2

Founders Network, "Founder Dating Ultimate Guide: Finding Your Perfect Co-Founder," blog post, https://foundersnetwork.com/blog/founder-dating/

Gao, Kaidi, "US VC Fundraising from an LP Perspective," Pitchbook, February 5, 2024. https://files.pitchbook.com/website/files/pdf/Q1_2024_PitchBook_Analyst_Note_US_VC_Fundraising_From_an_LP_Perspective.pdf

Girtu, Miruna, "Starting a VC Fund: 7 Key Criteria to Consider," *Forbes*, May 19, 2020. https://www.forbes.com/sites/mirunagirtu/2020/05/19/starting-a-vc-fund-7-key-criteria-to-consider/?sh=15094b713f2f

Gompers, Paul A. and Josh Lerner, "An Analysis of Compensation in the U.S. Venture Capital Partnership," *Journal of Financial Economics*, January 1999, v. 51, no. 1, pp. 3-44.

Guida, Palol, "The (Almost) Mission Impossible of Raising a First-Time Fund," *Forbes*, March 22, 2021. https://www.forbes.com/sites/forbesfinancecouncil/2021/03/22/the-almost-mission-impossible-of-raising-a-first-time-fund/?sh=7a1b84b44052

Jensen, Michael C. and William H. Meckling, "Theory of the Firm:  Managerial Behavior, Agency Costs and Ownership Structure," *Journal of Financial Economics*, October 1976, v. 3, no. 4, pp. 305-360.

Matthews, Jessica, "Raising a first-time fund? This is the worst time to do it in 10 years," *Fortune*, August 10, 2023. https://fortune.com/2023/08/10/worst-year-for-emerging-manager-fundraising/

McGrath, Charles, "First-time funds struggle for survival," Prequin blog, November 9, 2022. https://www.preqin.com/insights/research/blogs/first-time-funds-struggle-for-survival

Navas, Max, "Estimating US VC First-Time Manager Dropouts," Pitchbook, February 16, 2024. https://files.pitchbook.com/website/files/pdf/Q1_2024_PitchBook_Analyst_Note_Estimating_US_VC_First-Time_Manager_Dropouts.pdf

Pitchbook / National Venture Capital Association, "Venture Monitor: Q4 2022," https://files.pitchbook.com/website/files/pdf/Q4_2022_PitchBook-NVCA_Venture_Monitor.pdf

Pitchbook / National Venture Capital Association, "Venture Monitor: Q4 2023," https://files.pitchbook.com/website/files/pdf/Q4_2023_PitchBook-NVCA_Venture_Monitor.pdf

Porterba, James M., "Venture Capital and Capital Gains Taxation," published in *NBER Book Series:  Tax Policy and the Economy*, vol. 3, Lawrence A. Summers (ed.), MIT Press, 1989.

Wheater, Jenny, "Private Equity Fund Timeline," presentation by DuaneMorris, August 2014. https://www.duanemorris.com/site/static/private_equity_fund_timeline.pdf

Whyte, Amy, "These Are the Biggest Investors in Private Equity, *Institutional Investor*, June 14, 2018. https://www.institutionalinvestor.com/article/2bsxjfxhvm9dvwx7m0v7k/portfolio/these-are-the-biggest-investors-in-private-equity

Zhang, Hannah, "First-Time Funds Are Struggling To Raise Capital," *Institutional Investor*, November 11, 2022. https://www.institutionalinvestor.com/article/2bstleyd0am2nu8i69ekg/portfolio/first-time-funds-are-struggling-to-raise-capital

Zider, Bob, "How Venture Capital Works," *Harvard Business Review*, November-December 1998. https://hbr.org/1998/11/how-venture-capital-works#:~:text=Investors%20in%20venture%20capital%20funds,funds%20into%20high%2Drisk%20investments.

29 CFR § 2550.404a-1(b) of Rules and Regulations for Fiduciary Responsibility under the Employee Retirement Income Security Act of 1974.

World Wide Web Sources

https://ilpa.org/glossary/j-curve-effect/

https://ilpa.org/who-we-are/

https://www.affinity.co/webinar/fundraising-best-practices-with-isomer-capital-black-opal